IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 28, 2017

FILED

12/14/2017

Clerk of the
Appellate Courts

## STATE OF TENNESSEE v. ANDREW BERNARD BEVERLY

**Appeal from the Circuit Court for Sevier County**
**No. 20240     Paul G. Summers, Senior Judge**

_____

**No. E2017-00056-CCA-R3-CD**

_____

After a jury trial, the defendant, Andrew Bernard Beverly, was convicted of first-degree premeditated murder, first-degree felony murder, attempted first-degree murder, and possession of a firearm during the commission of a dangerous felony.  On appeal, the defendant asserts the evidence was insufficient to support his convictions for premeditated murder, felony murder, and attempted murder, arguing the State failed to prove the appropriate mens rea for the offenses.  The defendant also claims the trial court erred in denying his motion to suppress three statements made after his arrest claiming his *Miranda* waiver prior to the initial interview did not pass constitutional muster.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Edward C. Miller, Dandridge, Tennessee, for the appellant, Andrew Bernard Beverly.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Jimmy B. Dunn, District Attorney General; and Ronald C. Newcomb, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On March 3, 2015, a Sevier County Grand Jury indicted the defendant for twenty-three crimes for actions committed against victims, Angela Beverly and Jabari Dial.  At issue in this appeal are the crimes committed against the victims on September 24, 2014,

in Sevier County, Tennessee. On that day, the defendant shot and killed Ms. Beverly, his estranged wife, and attempted to kill Mr. Dial. After fleeing the scene of the shooting, the defendant was arrested in Harlan County, Kentucky on the evening of September 24, 2014. Subsequent to his arrest, the defendant gave three separate statements regarding his involvement in the crimes, twice to Sevier County officers and once to the news media. Following several pre-trial hearings, the defendant proceeded to trial for the first-degree, premeditated murder of Ms. Beverly (Count 1), the first-degree, felony murder of Ms. Beverly during the attempted murder of Mr. Dial (Count 3), the attempted first-degree, premeditated murder of Mr. Dial (Count 4), and the possession of a firearm during the commission of a dangerous felony (Count 18).[1]

## I.    Motion to Suppress

Prior to trial and significant to this appeal, the trial court conducted a hearing on the defendant's motion to suppress the three statements made after his arrest. The first statement occurred during the defendant's initial interrogation by Sevier County officers in Harlan County, Kentucky on September 25, 2014. The defendant made his second statement to the news media while still incarcerated in Harlan County on September 25, 2014. The third statement occurred on September 26, 2014, during the defendant's second interview with Sevier County officers after he was extradited to Tennessee. In his motion to suppress, the defendant argued he "did not waive his right against self-incrimination prior to his initial statement," thus rendering it involuntary. The defendant further argued the two "subsequent statements were fruit of the prior unconstitutional statement" and should be suppressed. The State disagreed, and presented evidence regarding the constitutionality and admissibility of the three separate statements at the suppression hearing.

Deputy Will Pope and Officer Michael Boggs were on duty in Harlan County, Kentucky on September 24, 2014, prior to the defendant's arrest. Deputy Pope testified he apprehended the defendant in a gas station parking lot in Harlan County and eventually charged him with first-degree murder on a Sevier County warrant. Neither Deputy Pope nor Officer Boggs interviewed the defendant upon his arrest; however, both officers testified the news media was at the Harlan County jail on September 25, 2014.

Captain Stephanie Hodges and Detective Jeff McCarter of the Sevier County Sheriff's Office conducted the initial interview of the defendant in Harlan County on September 25, 2014. During Captain Hodges' testimony, the State entered the audio recording and transcript of the initial interview into evidence. On cross-examination,

---

[1]The trial court dismissed Counts 2, 5, 6, 7, 8, 9, 10, 11, and 17 and severed Counts 12, 13, 14, 15, 16, 19, 20, 21, 22, and 23 under the original indictment.

Captain Hodges explained she and Detective McCarter conducted the interview in a chapel inside the Harlan County jail. When the defendant entered the chapel, Captain Hodges and Detective McCarter introduced themselves, explained why they were there, and read the defendant his *Miranda* rights. According to Captain Hodges, the chapel had an "outrageous" echo and, as a result, she did not initially record the interview with the defendant. However, after approximately five minutes she "decided to take [her] chances and hit record." Accordingly, the remainder of the interview was captured and transcribed.

After turning the recording on, Captain Hodges interrupted the defendant to confirm he understood his *Miranda* rights. Captain Hodges read the transcript of this portion of the interview into the record, stating: "I said, 'Okay, well, like I said, you understand what your rights are?' [The defendant] said, 'Right.' And then on page two, there's another one. Then on page two, 'And I read you your rights, okay, and you understand what they are?' [The defendant] said, 'Right.'" Captain Hodges further stated, "I read the *Miranda* warning to [the defendant] in the presence of Chief McCarter, explained to him why we were there. Okay? He was read his *Miranda* warnings." Though Captain Hodges read and explained the defendant's *Miranda* rights to him from a waiver, she acknowledged the defendant did not sign the waiver during the initial interview. Rather, the defendant signed a waiver of rights during the second interview with Sevier County officers conducted after his extradition to Tennessee on September 26, 2014. Despite his failure to sign a waiver, Captain Hodges testified the defendant waived his rights during the initial interview and "acknowledged to [her] that he was certainly ready to make a statement and answer questions and go forward."

Further, at the suppression hearing, Captain Hodges discussed why she did not stop the interview after the defendant indicated he might want "to talk to somebody." During the interview, the following exchange occurred:

> [The defendant]: I'm (inaudible) to talk to somebody because I mean you all talking to me like this right here.
> [Chief McCarter]: Well we're just telling you how it is.
> [Captain Hodges]: Hey, I've not lied to you once.
> [Chief McCarter]: We're just telling you how it is.
> [The defendant]: Well I'm trying to tell you guys how it all begin (sic), ok, that's what I'm trying to do.
> [Captain Hodges]: Well I'm all ears.

According to Captain Hodges, the defendant "continued to talk" after indicating he might want to talk to someone. She further explained:

[The defendant] made the statement along the lines of -- when I reread it, "maybe I should talk to somebody because you all are being harsh," something along those lines. And then Chief McCarter answered with, "We're just telling you how it is." Again, he was just at that point pretending to not know what we were talking about or why we were there. Your client was very cooperative and he understood his *Miranda* warnings and I explained those initially.

Though he was cooperative, the defendant initially denied any knowledge of the death of his wife, Ms. Beverly, even acting "surprised at first." However, as the interview progressed, the defendant ultimately confessed to shooting Ms. Beverly. The defendant further admitted he intended to shoot Mr. Dial on September 24, 2014. Before concluding the interview, the defendant signed forms consenting to the search of his car, telephone, and home.

Chief McCarter also testified regarding the defendant's initial interview in Harlan County, Kentucky. According to him, Captain Hodges read the defendant his *Miranda* rights prior to beginning the interview, despite them not being captured in the recording. At the motion to suppress hearing, Chief McCarter acknowledged he made a statement to the defendant during the interview suggesting that if he confessed, he might avoid the death penalty. Specifically, Chief McCarter testified this statement was made at a point in the interview when the defendant maintained he had no knowledge of Ms. Beverly's death. Chief McCarter stated: "You can set (sic) here and hold to that story and you can fry in the electric chair or you can set (sic) here and you can be a man and tell us what happened. It might help you from getting the death penalty." Chief McCarter explained he made the statement "to try to elicit a response from [the defendant]." However, Chief McCarter testified the comment was not a promise of leniency used to obtain a confession from the defendant. Captain Hodges testified Chief McCarter made this statement to the defendant during the initial interview.

Additionally, while in the Harlan County jail, the defendant agreed to speak to the news media. Chief McCarter testified that during "the latter part of the interview" a Harlan County officer interrupted the interview to inform the defendant the news media was ready to speak with him. Before the defendant gave a statement to the media, Chief McCarter discussed the request with the defendant. Chief McCarter explained:

As we were leaving the interview -- well, it wasn't an interview room. It actually, I believe, [was] a chapel. As we were walking out with [the defendant] and I believe it was Officer Moore from Harlan County jail, again, I stopped in the hallway and my words to [the defendant] were, ". . . I'm not your attorney and I'm in no way your legal adviser, but I believe if

- 4 -

I was a man in your shoes I don't believe I would be talking to the TV station." Then he just looked at me and said, "Thank you." And I believe he even shook my hand and that was the last time I ever saw him until we got back to Sevier County.

Regarding the defendant's media interview, Chief Derrick Moore of the Harlan County Sheriff's Department explained he approached the defendant with the news media's request for an interview. Chief Moore asked the defendant if he would like to speak to the media, and the defendant stated he would. Chief Moore testified he did not force the defendant to speak to the media, stating "if [the defendant] would have said no during the interview, we would have told them to shut the cameras off." Further, Chief Moore stated he had no control over the interview and would not have allowed it if the defendant stated he did not want to participate. During Chief Moore's testimony, the defendant's statement to the media was admitted into evidence and played at the suppression hearing. In the interview, the defendant again confessed to shooting Ms. Beverly and admitted he intended to shoot Mr. Dial.

Finally, Chief McCarter discussed the defendant's third recorded interview given on September 26, 2014. Prior to the interview, the defendant signed a written waiver of his *Miranda* rights. After doing so, the defendant showed Chief McCarter how he shot Ms. Beverly. According to Chief McCarter, the defendant's third statement was consistent with the statement from the first interview.

Upon its review, the trial court issued an order denying the defendant's motion to suppress the three statements finding the defendant knowingly waived his *Miranda* rights. The State proceeded to trial with this evidence.

## II.     Trial

At trial, the surviving victim, Jabari Dial, explained he was at Ms. Beverly's home in Sevier County, Tennessee on the morning of September 24, 2014. Around 10 a.m., Mr. Dial made coffee while Ms. Beverly prepared to take out the garbage. According to Mr. Dial, Ms. Beverly had to "walk around the corner [of the house] to take the trash to the trash can." Mr. Dial stated Ms. Beverly walked outside to do so, and then he heard her scream. After hearing Ms. Beverly scream, Mr. Dial looked outside and saw the defendant holding a gun over her. He described the scene, as follows:

Then the next -- from where I was standing in the window, I heard the scream and then the next thing I seen was I seen [Ms. Beverly] backing up holding the -- she was holding the trash bag still in one hand and holding

[the defendant's] hand with the gun over her head with another -- with her other arm as she was backing up.

Mr. Dial ran outside and asked the defendant, "what are you doing, why do you have a gun . . . what are you going to do, you going to shoot us now, shoot her now." According to Mr. Dial, the defendant stated, "yeah, I'm going to shoot her and then I'm going to shoot you." Mr. Dial "kind of froze for a minute," and then the defendant "took the gun and he pointed it down on top of [Ms. Beverly] and he shot her." After the defendant shot her once, "right on her head," Ms. Beverly fell to the ground face-first. During cross-examination, Mr. Dial testified the struggle between the defendant and Ms. Beverly lasted approximately "seven to eight minutes, conversation and all." He stated, "for the majority of the time [the defendant] had the gun over [Ms. Beverly] trying to point it down on top of her and she was trying to fight his hand back."

After the shot, Mr. Dial ran to a neighbor's house. He noticed the defendant's vehicle was parked on the side of the house near the garbage cans in an area that cannot be seen from inside the home. As Mr. Dial sought help from a neighbor, he saw the defendant drive away. The neighbor called 911, and Mr. Dial "ran back over to kind of check on [Ms. Beverly] to see what was going on and that's when she was dead."

Mr. Dial explained that prior to the shooting, he stayed with Ms. Beverly at her home when she asked him to do so. When he spent the night, Mr. Dial slept in the bed with Ms. Beverly "for [her] protection." Mr. Dial denied a sexual relationship with Ms. Beverly.

Charles Moffett worked with the defendant at Food City grocery store prior to the shooting. Mr. Moffett worked in the meat department of the store. He stated approximately three weeks before Ms. Beverly's death, the defendant approached him about borrowing a firearm. The defendant claimed he needed a gun to protect himself because he had recently been "beaten up" by his wife's boyfriend. At the time, however, Mr. Moffett did not see any injuries on the defendant. Regardless, Mr. Moffett gave the defendant a .22 revolver and ammunition which the defendant stored in the glove box of his red Pontiac SUV. Mr. Moffett stated the defendant did not return the gun.

Several of the defendant's neighbors, Christy Sellars, Troy Sellars, Gary Tarwater, Donna Tarwater, and Leslie Carl Parsons, testified they saw a red Pontiac parked between the Beverlys' home and a retaining wall near their garbage cans either prior to or on September 24, 2014. Further, Mr. Parsons testified he heard a woman scream twice, and then heard what "sounded like a pistol shot" around 11:05 a.m. on September 24, 2014. When he looked out his window, Mr. Parsons saw a red vehicle leaving the area of the Beverlys' home "going fairly fast." Donna and Gary Tarwater also heard two

screams coming from the Beverlys' home around 11:00 a.m. Ms. Tarwater saw a red SUV "[m]aking several forward and reverse motions" to get out of the driveway. Mr. Tarwater further stated, he "saw [the defendant] run to his vehicle, get in his vehicle and made several backing attempts so he wouldn't run over [Ms. Beverly]," whose body was lying "partially in the driveway." Mr. Tarwater later used his metal detector to try to locate the gun used by the defendant; however, he was unsuccessful in finding the weapon.

Troy Sellars testified he did not hear screams or a gunshot on September 24, 2014. Rather, around 11:15 a.m., he heard a "loud knocking on [his] front door." Mr. Sellars "retrieved [his] firearm" and opened the door to Mr. Dial who was "extremely distraught." At the victim's home, he saw Ms. Beverly lying face down with "a very bloody spot on the top of the head and blood coming from the top of the head." Mr. Sellars called 911 and remained on the scene until officers arrived.

Deputies Aaron Foster, Ryan Cleveland, and Robert Stoffle of the Sevier County Sheriff's Office responded to the 911 call at the Beverlys' residence. Upon arrival, Deputy Foster saw Ms. Beverly lying face-down with an injury to the head. Deputy Stoffle stated Ms. Beverly's body was "in the driveway at the back of the house." Deputies Foster and Cleveland secured the scene. Deputy Foster made an initial report, and Deputy Cleveland produced a crime scene log which was entered into evidence. Additionally, Deputy Foster interviewed Mr. Dial who completed a written statement on the scene. Deputy Stoffle tried to locate the defendant in the area, but was unsuccessful.

Tom Weekly, a chaplain with the Sevier County Sheriff's Office, was riding with Deputy Foster at the time of the 911 call. At the Beverlys' home, he saw Ms. Beverly deceased with a gunshot wound to the head. Mr. Weekly spoke to Mr. Dial at the scene, describing him as "[a]gitated, concerned, [and] very sorrowful about a long-term person that he had known."

David Walker and Michael Beningo, Sevier County Ambulance Service employees, were dispatched to the scene for "a possible shooting." Upon their arrival, Mr. Walker and Mr. Beningo saw a gunshot wound to the top of Ms. Beverly's head. Mr. Beningo explained they did not try to resuscitate the victim because of "[t]he obvious signs of death." After the investigation was complete, Mr. Walker and Mr. Beningo transported Ms. Beverly's body to the local hospital.

Captain Hodges processed the crime scene on September 24, 2014. When she arrived on the scene, Ms. Beverly was lying face-down on the ground. Captain Hodges placed bags over the victim's hands to preserve any evidence and took photographs,

video, and measurements of the crime scene. Captain Hodges testified they were unable to locate the murder weapon.

On September 25, 2014, Captain Hodges interviewed the defendant with her partner, Chief McCarter, while the defendant was in custody in the Harlan County, Kentucky jail. Before beginning the interview, Captain Hodges read the defendant his *Miranda* rights, which the defendant waived. Captain Hodges' trial testimony concerning the procedural aspects of the initial interview was consistent with her testimony from the suppression hearing regarding the same.

As to the substance of the defendant's initial statement, Captain Hodges explained, "[a]t first he acted like he did not know why we were there and didn't know what was going on." However, as the interview progressed, the defendant admitted to driving to his home in Sevier County in a red vehicle and parking on the backside of the house near the garbage cans. The defendant stated he waited in his car until Ms. Beverly came outside to take out the trash, admitting "[t]hat he knew her routine, when she fed the cat, when she fed the dog, when she took the trash out, and that he knew that she would be coming out around that time frame to do so." Additionally, the defendant stated he parked his car near the garbage cans on the side of the house because "[h]e didn't want them to know he was there. He wanted to put the car back there where they couldn't see him until she came out." As he waited in his car for approximately one hour, the defendant listened to Ms. Beverly and Mr. Dial talking on the front porch.

Eventually, the defendant saw Ms. Beverly emerge from the house, and he got out of his vehicle with the gun. When he got out of the car, "[the defendant] said he grabbed [Ms. Beverly] and shot her." Further, the defendant stated:

> When [Ms. Beverly] came out, she said ["]ah,["] and I grabbed her, I grabbed her like this here and I had a gun and I pointed down and it just shot and that's what it did. I grabbed and it shot. The next thing you know she fell down and I said ["]oh god["] and then I went over there and I said ["]Angela are you alright.["] Like I said, she just didn't move. So I tossed the gun and got in my car and I just left, that's exactly what I did.

The defendant stated he did not know where he shot Ms. Beverly, but told Captain Hodges he fired the gun only once. After shooting Ms. Beverly, the defendant "tossed" the gun and fled the scene. He stated he got the gun and ammunition from Charles Moffett, a man he worked with at Food City. Additionally, the defendant admitted he intended to "hurt" and "shoot" Mr. Dial on September 24, 2014. At the end of the initial interview, the defendant signed consent to search waivers for his car, cell phone, and home. The recording of the interview was played for the jury at trial.

On cross-examination, Captain Hodges explained the defendant was upset that Mr. Dial was living in his house with his wife. The defendant also claimed to have caught Ms. Beverly having sex with another man on August 8, 2014, prior to the shooting. Further, the defendant stated he did not intend for the gun to go off. Captain Hodges testified the defendant seemed remorseful for Ms. Beverly's death.

The State then played the defendant's interview with the news media for the jury and recalled Captain Hodges who testified the defendant's initial interview occurred prior to the interview with the media. According to Captain Hodges, Chief McCarter advised the defendant against speaking to the media, stating "[t]hat he didn't have to talk to the media, he shouldn't do it." During the media interview, the defendant again admitted to shooting Ms. Beverly and stated his intent on September 24, 2014 was to shoot Mr. Dial. Finally, Captain Hodges testified the defendant "went to [a] Maryville residence directly after [the shooting] and stayed for [sic] there for a while and then went to eat at Ruby Tuesday's with a friend and then left about four or 4:30 to go to Harlan."

Deputy Chief McCarter then testified. Chief McCarter's testimony describing the defendant's initial interview mirrored his testimony from the suppression hearing regarding the same. Chief McCarter stated Captain Hodges provided the defendant with appropriate *Miranda* warnings, and then proceeded with the interview. Additionally, he explained the defendant signed a waiver of rights prior to the second interview conducted on September 26, 2014, after the defendant was extradited to Sevier County. Portions of the September 26 interview were then played for the jury.

Regarding the September 26 interview, Chief McCarter testified the defendant demonstrated how he fired the weapon at Ms. Beverly. Chief McCarter explained:

> [The defendant] again during that interview started alluding to the fact that -- and again, we started talking about [Ms. Beverly's] height. I believe he told me she was about five-three or five-four, and he told me he was about six foot tall. And of course I think I'm asking the question, without looking at the transcript, about how he -- I said, did you have her around the head. And he said, no. He said he had her around the upper part of her body and that he had the gun, and he indicated, which was on the video, that it was pointed like to where it's the top of her head.

The defendant told Chief McCarter his intentions on September 24, 2014, were to talk to Ms. Beverly and to hurt Mr. Dial. When Chief McCarter asked the defendant about his intentions during the interview, the defendant responded, as follows: "[W]ell, I was just right outside where we take our garbage at. If you see where the garbage is at I promise

you my intention was not to hurt my wife, shoot my wife or anything. My intention was to hurt him, not kill him, but to hurt him." The defendant again stated he parked his car near the garbage cans on the side of the house because he knew Ms. Beverly would not be able to see it in that location. The defendant denied threatening Mr. Dial stating he did not see anyone else come out of the house during his altercation with Ms. Beverly. The defendant also claimed he was assaulted prior to September 24, 2014, and he admitted to having someone load the gun for him prior to the shooting.

Additionally, during the September 26 interview, the defendant stated he told his mother about the shooting. Chief McCarter explained:

> [The defendant] just said [his mother] asked him -- he told her he was in the Harlan County jail. She asked him what was going on. He said, Mom, I done something I had no business doing. And she said, did you shoot that girl, and I said yes, but I said it was an accident, that I had no intentions of doing it. And she said I knew better. She said I knew better than to do anything like that, you knew better than to have a gun [in] your possession. And then he goes on and talked about getting jumped, and she said it didn't matter. She talked about it was more of a man to have a gun in his possession. She said, you've got two fists, you should have used them. She said if you got your butt whooped, you got your butt whooped, and that's how my mom explained it to me, and she was the only one that told me about it because I didn't tell anybody else.

On cross-examination, Chief McCarter confirmed officers failed to locate the gun used by the defendant. Further, Chief McCarter testified the defendant stated he tried to talk to Ms. Beverly about Mr. Dial living in his house prior to shooting her. According to the defendant, when he did, Ms. Beverly said, "[Mr. Dial] has that right." The defendant then "grabbed" Ms. Beverly and, according to the defendant, he "pointed the gun down and it went off."

Dr. Darinka Mileusnic-Polchan, an expert in forensic pathology, performed the autopsy of Ms. Beverly on September 25, 2014. Dr. Mileusnic-Polchan testified the victim's cause of death was a contact gunshot wound of the head. Dr. Mileusnic-Polchan found gunpowder in Ms. Beverly's scalp, indicating the gun was in "tight contact" with the head. She recovered a small caliber lead bullet that "became shaved and fragmented by going through the bone on the right side of the head and also hitting the bone on the left base of the skull." Dr. Mileusnic-Polchan stated the bullet entered the head "from top down, very steeply, and from right to left." She opined the trajectory of the bullet was "unusual" at approximately a 45 degree angle. Additionally, Dr. Mileusnic-Polchan

noted Ms. Beverly had abrasions and contusions on her face from falling to the ground after the shot.

The defendant's work associate, Steve Trout, and Ms. Beverly's work associate, Litton Cochran, also testified at trial. Mr. Trout stated he began working with the defendant in the mid-2000's and that the defendant was a good manager. Mr. Cochran testified he worked with Ms. Beverly for fifteen years at a local McDonald's. Mr. Cochran described Ms. Beverly as "consistent" and "reliable," stating he hoped she would become the next manager of the McDonald's.

Finally, the State called Glenn Parton, who talked to the defendant about his personal life and criminal activity while both were incarcerated in the Sevier County jail. Mr. Parton stated the defendant told him he purposefully "shot [Ms. Beverly] in the head." Mr. Parton testified the defendant offered him money and a car in exchange for killing the witness to Ms. Beverly's murder. During cross-examination, Mr. Parton explained at the time of the conversations with the defendant, he was in jail for misdemeanors but was housed in maximum security because he had previously been attacked in jail and because of his familial connection to law enforcement officials. Mr. Parton stated his conversations with the defendant occurred "in front of the intake" at the jail between June 7, 2016 and June 14, 2016. Mr. Parton admitted to providing information to law enforcement in the past.

The defendant presented proof from the Sevier County Sheriff's Office to rebut Mr. Parton's testimony at trial. Specifically, Lieutenant Matthew Cubberley, Detective Maria Cutshaw, Chief McCarter, and Captain Hodges testified that Mr. Parton previously gave unconfirmed information to law enforcement "about a body that was buried in Knox County." Additionally, Captain Ken Hatcher of the Sevier County jail testified that according to his records, Mr. Parton was not housed in maximum security. However, during cross examination, Captain Hatcher stated it is possible Mr. Parton could have been housed in maximum security for a period of time that was not documented correctly.

The State recalled Mr. Parton who described the area of the jail where he spoke to the defendant as "the kiosk" in the common area where all inmates have "rec time." During their conversations, the defendant told Mr. Parton he drove a SUV, his wife had been cheating on him, he got a gun from his coworker who worked in the meat department, and he shot Ms. Beverly in "[t]he top of the head." The defense presented surrebuttal proof from Captain Hatcher who further described the set-up of the jail, stating general population and maximum security inmates use separate kiosks. However, Captain Hatcher stated in the booking area of the jail, it is possible for inmates from

maximum security to interact with inmates not in maximum security. Both sides then rested.

The jury found the defendant guilty of first-degree, premeditated murder and first-degree, felony murder of Ms. Beverly, attempted first-degree, premeditated murder of Mr. Dial, and possession of a firearm during the commission of a dangerous felony. The trial court merged the convictions for premeditated and felony murder, and sentenced the defendant as a Range I offender to life in prison with the possibility of parole as to both convictions. For the attempted murder conviction, the trial court sentenced the defendant as a Range I offender to a concurrent, fifteen-year sentence. Finally, the trial court imposed a three-year sentence for the possession of a firearm conviction to be served consecutively to his effective life sentence. The defendant filed a motion for new trial which was denied by the trial court, and this timely appeal followed.

## ANALYSIS

On appeal, the defendant presents two issues for our review. First, the defendant claims the trial court erred in denying his motion to suppress the three statements made after his arrest. The defendant argues he did not knowingly waive his *Miranda* rights prior to the initial interview, thus rendering all three of the statements unconstitutional and subject to suppression. Secondly, the defendant asserts insufficient evidence exists to uphold his convictions for first-degree, premeditated, felony, and attempted murder. The State contends the trial court did not err in denying the defendant's motion to suppress as the record shows he properly waived his *Miranda* rights prior to the first interview and, as a result, the subsequent interviews are not "fruit of that unconstitutional statement." Additionally, the State asserts sufficient evidence exists to support his murder convictions and the attempted murder conviction. After our review of the record, we agree with the State, and will address each issue in turn.

### I.    *Suppression of the Statements*

Suppression issues on appeal are subject to a well-established standard of review. Appellate courts are bound by a trial court's findings of facts determined after a suppression hearing unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Matthew T. McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2 (Tenn. Crim. App. Sept. 13, 2012). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Appellate courts should consider the entire record, affording the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence." *McGee*, No. E2011-01756-CCA-R3-CD, 2012

WL 4017776, at *2 (citing *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001)); *see also State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). However, applying the law to the factual findings of the trial court is a question of law, which is reviewed *de novo* on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). When reviewing the trial court's ruling on a motion to suppress, appellate courts may consider the evidence presented at both the suppression hearing and the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

On appeal, the defendant challenges the constitutionality of the waiver of his *Miranda* rights made prior to giving an initial statement to Sevier County officers after his arrest. The Fifth Amendment to the United States Constitution, applicable to states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. If a suspect is in police custody "or otherwise [has been] deprived of his freedom of action in any significant way," the police must first inform him of his Fifth Amendment rights for any subsequent confession to later be admissible as substantive evidence. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In this regard, the United States Supreme Court has said, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* These rights may be voluntarily, knowingly, and intelligently waived. *Id.*

The *Miranda* decision only applies "to the questioning of an individual who has been taken into custody or otherwise deprived of his freedom by the authorities in a significant way." *State v. Dailey*, 273 S.W. 3d 94, 102 (Tenn. 2009) (quoting *Miranda*, 384 U.S. at 478) (internal quotation marks omitted). Accordingly, *Miranda* warnings are only required when a suspect is (1) in custody and (2) subjected to questioning or its functional equivalent. *State v. Walton*, 41 S.W. 3d 75, 83 (Tenn. 2001). In the absence of either, *Miranda* requirements are not necessitated. *Id.*

The test for determining if an individual is in custody for *Miranda* purposes is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). The defendant's initial statement, given while he was incarcerated in Harlan County, Kentucky, was clearly the result of a custodial interrogation. Thus, in order to be admissible, the defendant's statement must have been voluntarily given. *See Arizona v. Fulminate*, 499 U.S. 279, 286-88 (1991); *see also State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (stating "the voluntariness test remains distinct from *Miranda*").

- 13 -

A confession is involuntary if it results from "'any sort of threats or violence, . . . any direct or implied promises, however slight, . . . [or] by the exertion of any improper influence.'" *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). When evaluating the voluntariness of a statement, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion." *Climer*, 400 S.W.3d at 568. A defendant's subjective perception alone is insufficient to support a finding that a confession was not voluntary. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). Instead, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id*.

One form of coercive state action occurs when officers make promises of leniency prior to a confession. "However, '[p]romises of leniency by state officers do not render subsequent confessions involuntary *per se*: The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are compelled by promises of leniency.'" *State v. Sanders*, No. W2014-01513-CCA-R3-CD, 2015 WL 9433473, at *8 (Tenn. Crim. App. Dec. 23, 2015), *perm. app. denied* (Tenn. May 10, 2016) (quoting *Smith*, 933 S.W.2d at 455 (internal quotations omitted)). "The determinative question is 'whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Id*. (quoting *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980)). When evaluating the voluntariness of a statement, courts consider the totality of the circumstances, including "characteristics of [the] accused and details of the interrogation." *Climer*, 400 S.W.3d at 568. Relevant factors include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id*.

In the present case, the defendant asserts he "did not waive his right against self-incrimination during his initial interview with law enforcement in Harlan, Kentucky," thus rendering the two subsequent statements as "fruit of the prior unconstitutional

- 14 -

statement." We disagree. The record supports the trial court's finding that the defendant waived his *Miranda* rights prior to the initial interview in Harlan, Kentucky. As a result, the initial statement was admissible and not subject to suppression. Further, the record shows the second statement, given to the news media, was made voluntarily and was not the result of state action, also rendering it admissible and not subject to suppression. Finally, the record indicates the defendant understood and executed a *Miranda* waiver prior to the third statement given on September 26, 2014. Accordingly, the third statement passes constitutional muster and was not subject to suppression. Though we conclude the trial court did not err in denying the defendant's motion to suppress, we will address the specific findings of the trial court in detail below.

Looking first to the Sevier County officers' initial interview with the defendant in the Harlan County jail, the trial court found Captain Hodges properly *Mirandized* the defendant before questioning him. In examining the constitutionality of the initial statement, the trial court stated:

> The first level of inquiry, as it relates to confession or statement, number one, is whether the *Miranda* warnings had been given. Obviously this was a custodial interrogation, which mandated that those rights be given. The defendant argues that as the officers had an audio device available, that the absence of that is somewhat evidence that they were not given. They also point to statements made by the defendant, which could or could not be taken as that he wanted to talk to an attorney.

> The [c]ourt will say this. First of all, that the only evidence before the [c]ourt that challenges the testimony of [Captain] Hodges and then Detective McCarter is by negative inference, if you will, that because it was not recorded, it did not in fact happen, and the nebulous statement of [the defendant] saying "right." And so this [c]ourt must find, and does so find, that based upon the credibility of the officers testifying in this case, that they did in fact advise this defendant of his constitutional rights as is required by *Miranda*.

> The second point to be addressed is whether or not the defendant requested an attorney. Obviously when a defendant requests an attorney, the questioning has to immediately stop. There are some exceptions where a defendant may reinstitute discussions but that is not relevant for our discussion. The [c]ourt finds, and must find, that there is nothing in this record which indicates that this defendant gave an unequivocal indication that he wanted an attorney, and in fact the [c]ourt is satisfied, based on his statements and the total circumstances of the interrogation, that he in fact

- 15 -

did not want them to either quit talking to him or to make sure that he had an attorney appointed to him. So for that reason, as to statement number one, the [c]ourt must find and does so find that the taking of the statement in question certainly satisfies constitutional standards.

Upon our review of the record, we agree with the trial court's finding that the defendant received proper *Miranda* warnings, which he waived, prior to the initial statement. When the defendant entered the interview room, Captain Hodges introduced herself and Chief McCarter and explained to the defendant why they were speaking with him. Both Captain Hodges and Chief McCarter testified Captain Hodges read the defendant his *Miranda* rights prior to beginning or recording the interview. Captain Hodges testified after turning on the recording device, she again confirmed with the defendant that he understood his rights. After receiving an affirmative response from the defendant, the interview continued. The trial court found the testimony of Captain Hodges and Chief McCarter to be credible and nothing in the record preponderates against this finding of fact. Accordingly, we will not disturb it on appeal. *Odom*, 928 S.W.2d at 23; *McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2.

Turning to the voluntariness of the defendant's initial statement, we again find no error in the trial court's finding that the defendant made the statement voluntarily. In reaching its decision, the trial court considered the totality of the circumstances surrounding the initial interview by detailing the "characteristics of the [defendant] and the details of the interrogation." *Climer*, 400 S.W.3d at 568 (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). The trial court stated:

Now, the [c]ourt has seen the medical records pertaining to this defendant's mental capacity. No question that at least according to the information that I have been shown in the record that in some testing on some factors that he does rate below average intelligence. And at this point for purposes of what I'm doing, the [c]ourt has no problem in accepting that. The other side of it is, however, that officers do not have the responsibility of having mental exams done before they interrogate somebody unless there's something just extremely obvious. And in this case, just looking at the video alone, this [c]ourt would see no reason to indicate that the defendant in this case didn't know what he was doing. As I say, I have -- and granted, this is not to condemn or make fun or anything, but I mean, it is obvious to this [c]ourt that he sure knew what he was saying when he gave these interviews. And so I see no evidence, I see no evidence, that indicates that any deficiencies of this defendant had any impact on the statements that he gave. He was a willing confesser, if you will.

Upon our review of the record as a whole, we agree with the trial court's assessment of the voluntariness of the defendant's initial statement. At the time of the initial interview, the defendant was a high school graduate in his forties. He maintained a successful career with Food City, working his way up to a managerial position. The interview lasted an hour "at least, maybe more" the morning after the defendant's arrest. Both Captain Hodges and Chief McCarter testified the defendant received *Miranda* warnings before being questioned, despite the warnings not being captured on the recording of the interview. The trial court accredited the testimony of the officers. *Odom*, 928 S.W.2d at 23; *McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2. Additionally, after Captain Hodges initiated the recording, she confirmed the defendant understood his *Miranda* rights and received an affirmative answer from the defendant before continuing the interview. No evidence of injury, intoxication, or ill health as to the defendant exists in the record. There is also no evidence the defendant was deprived of food, sleep, or medical attention, or that he was threatened with abuse prior to or during the interview. Accordingly, the circumstances surrounding the defendant's initial interview support the trial court's finding that the defendant made a voluntary statement during his initial interview with Sevier County officers.

Furthermore, the record also supports the trial court's finding that the defendant's initial statement was made absent police coercion. The defendant argues the "officers used psychological coercion that overbore" his will. Specifically, the defendant cites Chief McCarter's statement wherein he alludes the defendant might avoid the death penalty and "fry[ing] in the electric chair" if he told the truth. However, upon our review, the record indicates the defendant was cooperative during the initial interview and he understood his rights prior to making a statement. The trial court analyzed the facts surrounding the defendant's initial confession in the context of Chief McCarter's death penalty statements, as follows:

> Now, let me say this -- of the Fifth Amendment. Let me say this. The requirements, generally, of the exclusionary rule, are to keep -- is to punish, properly so in the [c]ourt's opinion, any misconduct on behalf of law enforcement. That's why it was developed and has been stated and restated since the sixties. And in this case -- and certainly Tennessee does not recognize a good faith exception, so we're not on that point -- but as one of the factors a court should consider in determining the admissibility of a statement is, you know, what were the officers trying to do. What were they trying to do. Again, not to excuse misconduct, but to try to glean from in fact were they trying to avoid complying with *Miranda*. This [c]ourt finds that there is no evidence of that. As I said, I will be real candid with you, as we all know, that anytime the death penalty is mentioned, it does

- 17 -

raise the attention of every court, and our supreme courts of the nation and the state have cautioned us about that. But the [c]ourt does not think that any statement about the death penalty impacted this defendant's willingness to cooperate nor did it override any effort by him to keep from talking.

Again, we agree with the trial court's finding that Chief McCarter's statements were not coercive. The record shows Chief McCarter discussed the death penalty as a possible outcome for the defendant during the initial minutes of the interview. At the time, the defendant denied involvement in and knowledge of Ms. Beverly's death. After the statements were made, the defendant began to discuss the marital issues he and Ms. Beverly faced at the time of the shooting. Specifically, the defendant discussed a "verbal altercation" he had with Ms. Beverly on August 8, 2014. He explained after the altercation, he left the marital home and began staying in hotels near the Food City in Alcoa, Tennessee. During this time, he also purchased an engagement ring for a girlfriend who lived in Maryville, Tennessee. Additionally, the defendant detailed how the couple struggled with infidelity in the last five years of marriage. After discussing the above issues, the defendant said, "I've got to get this off my chest," before describing the events that led to the shooting and ultimately confessing to Ms. Beverly's murder. Accordingly, nothing in the record indicates Chief McCarter's statements compelled the defendant's confession. *See Sanders*, No. W2014-01513-CCA-R3-CD, 2015 WL 9433473, at \*8. Rather, after Chief McCarter's statements, the defendant talked in detail about his marital problems before confessing to shooting Ms. Beverly. Though Chief McCarter indicated he made the comments about the death penalty in order to elicit a response from the defendant, there is no evidence Chief McCarter extended a specific promise of leniency to the defendant in exchange for a confession. Therefore, Chief McCarter's statements about the death penalty, when examined in the context of the entire interview, were not such to "overbear [the defendant's] will to resist" confessing to Ms. Beverly's murder. *Id.* While we do not condone the language used by Chief McCarter during the initial interview with the defendant, nothing in the record preponderates against the trial court's finding of fact that the defendant's confession was voluntarily given free from police coercion. *Odom*, 928 S.W.2d at 23; *McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at \*2. Accordingly, relying upon the record and the defendant's confession itself, we agree with the trial court's assessment of the voluntariness of the defendant's statement. The defendant is not entitled to relief as to this issue.

Looking next to the defendant's statement to the media and his third statement on September 26, 2014, the trial court again found both statements not subject to suppression. The trial court found the media statement occurred absent state action and the third statement was accompanied by a signed *Miranda* waiver of the defendant. The trial court explained:

- 18 -

As to the second one, the interview by the news media, as I say, the [c]ourt -- they asked open-ended questions. They did not lead him down the primrose path of anything. They asked him open-ended questions and he answered. You know, part of it, at least according to his statements, would be trying to lessen his awareness of what was going on, and that will be an issue I'm assuming for the jury to determine. The testimony is uncontradicted in this record as to what the officers from Kentucky said. While I would admit, I would admit, that it is somewhat strange -- or let me say this. We don't see many cases where the defendants give interviews. However, I have had two in my career, much to my chagrin, and both of them went to the penitentiary because I was unable to exclude their statements. But there is no evidence that the law enforcement in either state did anything wrong in this case. The defendant was asked, apparently it was passed through the officers to the defendant, if he would be willing to talk to [the media], and apparently and obviously he was. But all of the five officers who testified here, there was nothing that indicated -- no testimony that they asked him to speak to the media. And in fact, as I said, Detective Hodges and Detective McCarter both told him that he did not have to do that and in fact indicated that it would not be in his best interest. So they did everything they should have done in that situation. And then the third statement was given, and the defendant was *Mirandized* on that.

Again, we agree with the trial court's assessment of the admissibility of the defendant's final two statements. As to the media statement, nothing in the record indicates the media request occurred as a result of state action. Rather, officers passed on the media request for an interview, and the defendant agreed to the same. For a confession to be deemed involuntary, "it must be the product of coercive state action." *State v. Downey*, 259 S.W.3d 723, 733 (Tenn. 2008) (internal citations omitted). Not only was the media confession not the result of state action, but both Chief McCarter and Chief Moore advised the defendant he did not have to give a statement to the media and in fact, should not do so. Finally, the defendant executed a *Miranda* waiver prior to the September 26, 2014 statement and nothing in the record indicates the waiver was obtained improperly. Accordingly, the trial court properly denied the defendant's motion to suppress as it relates to the defendant's statements to the media and on September 26, 2014.

In ruling on the defendant's suppression motion, the trial court stated "that each and every statement was given in compliance with the requirements of the Fifth Amendment and that there is no constitutional basis to exclude either of the three, and, therefore, the motion to suppress each and every one of the statements is hereby

respectfully overruled." Nothing in the record preponderates against the trial court's assessment that all three statements were given voluntarily and passed constitutional muster. The defendant is not entitled to relief.

## II.    *Sufficiency of the Evidence*

The defendant next challenges the sufficiency of the evidence as to his first-degree, premeditated, felony, and attempted murder convictions, arguing generally that the State failed to prove the appropriate mental state for the convicted offenses.[2] Upon our review of the record, however, we disagree.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a

---

[2]The defendant does not contest the sufficiency of the evidence as it relates to his possession of a firearm conviction. As such, it is not addressed in this appeal.

convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

###### A. First-Degree, Premeditated Murder of Ms. Beverly and Attempted First-Degree Murder of Mr. Dial

In the instant case, the jury convicted the defendant of the first-degree, premeditated murder of Ms. Beverly and the first-degree, attempted murder of Mr. Dial. First-degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In this context, premeditation is "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id.* Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

In attacking the sufficiency of the evidence as to his first-degree, premeditated and first-degree, attempted murder convictions, the defendant argues "the [S]tate failed to prove beyond a reasonable doubt that the [d]efendant killed [Ms. Beverly] at a time when

his mental state was [] significantly free from excitement or passion to be capable of premeditation." In support of this argument, the defendant claims Ms. Beverly's "death was the result of raw emotion fueled by an extra marital affair coupled with the [defendant] witnessing sexual intercourse with another man in the marital home." The record, however, does not support the defendant's argument.

Rather, the evidence, supported by three confessions from the defendant, shows that on September 24, 2014, the defendant drove to his home in Sevier County and parked in an area beside the house where he knew Ms. Beverly would not be able to see his car. The defendant was armed with a gun he borrowed from his co-worker, Mr. Moffett, three weeks prior to the shooting. The defendant then stored the gun in his car prior to the shooting. After parking outside of his home, the defendant waited in his car for approximately one hour, listening to Ms. Beverly and Mr. Dial carry out their morning routine. The defendant admitted he knew Ms. Beverly's routine, specifically when she would come outside to take out the garbage. When Ms. Beverly came outside, the defendant got out of his car armed with a gun, grabbed Ms. Beverly, and pointed the gun to her head. Mr. Dial ran outside. As the defendant held the gun to Ms. Beverly's head, he threatened to shoot both Ms. Beverly and Mr. Dial. The defendant then shot Ms. Beverly in the head, and Mr. Dial ran for help. The defendant "tossed" the gun and fled the scene. In the hours after the murder, the defendant went to a friend's house and then out to dinner.

Looking specifically to the premeditation factors outlined by our Supreme Court, the record establishes the defendant parked outside of the home where he knew Ms. Beverly and Mr. Dial to be in an area where they could not see him. As he waited outside of the home for over an hour, the defendant listened to Ms. Beverly and Mr. Dial talk on the porch and go about their morning routine. The defendant knew Ms. Beverly's specific routine, including when she fed the pets and took out the garbage. When Ms. Beverly came outside to take out the trash, the defendant attacked Ms. Beverly, who was unarmed. When Mr. Dial came outside and asked what he was doing, the defendant stated he intended to kill Ms. Beverly and Mr. Dial. At the time of the threats, the defendant had Ms. Beverly restrained and was pointing a gun to her head. Furthermore, the defendant admittedly obtained the murder weapon three weeks prior to the shooting. After the shooting, the defendant went to a friend's house and then out to dinner. *See Bland*, 958 S.W.2d at 660. Accordingly, the record is sufficient to establish the defendant committed the premeditated murder of Ms. Beverly.

Though the defendant reported he was upset by the relationship between Ms. Beverly and Mr. Dial, the record does not support a finding that he committed the murder in the heat of passion. Rather, the evidence shows the defendant planned and executed the murder of Ms. Beverly after obtaining a gun weeks in advance, lying in wait,

undetected outside of the home, and attacking Ms. Beverly in a moment the defendant knew she would be outside, unarmed, and alone. As such, the defendant's heat of passion argument fails as the record supports the jury's finding of premeditation in that he planned and executed the murder of Ms. Beverly free from "raw emotion fueled by an extra marital affair." The defendant is not entitled to relief as to this issue.

The defendant also attacks the sufficiency of the evidence as it relates to his conviction for the attempted first-degree murder of Mr. Dial. As relevant in this case, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3); *see State v. Dickson*, 413 S.W.3d 735, 745 (Tenn. 2013). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." *Id*. § 39-12-101(b). As noted *supra*, first degree murder is the premeditated and intentional killing of another person. *Id*. § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of reflection and judgment." *Id*. § 39-13-202(d). In assessing attempts, our Supreme Court has stated:

> [W]hen an actor possesses materials to be used in the commission of a crime, at or near the scene of the crime, and where the possession of those materials can serve no lawful purpose of the actor under the circumstances, the jury is entitled, but not required, to find that the actor has taken a "substantial step" toward the commission of the crime if such action is strongly corroborative of the actor's overall criminal purpose.

*State v. Reeves*, 916 S.W.2d 909, 914 (Tenn. 1996).

Here, the record contains sufficient proof that the defendant took a substantial step toward killing Mr. Dial on September 24, 2014. *Id*. Not only did the defendant confess that his intent on September 24, 2014 was to shoot Mr. Dial, but also he initiated a plan to make his intentions a reality. In his attempt to kill Mr. Dial, the defendant waited outside of his marital home as Mr. Dial and Ms. Beverly carried out their morning routine. The defendant concealed his presence by parking in an area where he knew Ms. Beverly and Mr. Dial would not be able to see him from inside the home. In his car, the defendant had a loaded and ready-to-use gun that he obtained weeks in advance of the shooting. When Ms. Beverly exited the house, the defendant grabbed her so that she could not escape. Ms. Beverly screamed, and Mr. Dial came outside to find the defendant pointing a gun at her. The defendant threatened to shoot both Ms. Beverly and Mr. Dial, and in fact, did shoot Ms. Beverly in the head. After his arrest, the defendant admitted in his

- 23 -

statements to Sevier County officers that he intended to shoot Mr. Dial when he went to the home on September 24, 2014. The defendant also confessed his intent to shoot Mr. Dial to the news media in the statement he made on September 25, 2014. As such, the record makes clear the defendant attempted to kill Mr. Dial in that his course of action on September 24, 2014 constituted a substantial step toward the commission of the murder. The defendant waited with a loaded gun outside of the home where he knew Mr. Dial to be and then threatened to shoot Mr. Dial while holding a gun to Ms. Beverly's head. The defendant is not entitled to relief as to this issue.

### B. First-Degree, Felony Murder of Ms. Beverly

Finally, the jury convicted the defendant of the first-degree, felony murder of Ms. Beverly committed during the first-degree, attempted murder of Mr. Dial. First-degree, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder." Tenn. Code Ann. § 39-13-202(a)(2). "The plain meaning of the felony murder statute is that a killing in the course of an attempted first degree murder is first degree felony murder." *Millen v. State*, 988 S.W.2d 164, 167 (Tenn. 1999). First degree murder "remains, in a class by itself, [as] an offense classified even higher than a Class A felony." *Coleman v. Morrow*, No. E2010-02299-CCA-R3-HC, 2011 WL 3667724, at *2 (Tenn. Crim. App. Aug. 22, 2011). In analyzing our legislature's definition of intentional acts as it relates to first-degree murder, our Supreme Court explained:

> The legislature has broadly defined an "intentional" act as: "a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (1991). A plain reading of this statute as applied to first degree murder indicates that a defendant's conscious objective need not be to kill a specific victim. Rather, the statute simply requires proof that the defendant's conscious objective was to kill a person, i.e., "cause the result." In short, if the evidence demonstrates that the defendant intended to "cause the result," the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (i.e., intended result), is first degree murder.

*Millen*, 988 S.W.2d at 168.

In the present case, the evidence is sufficient to support the elements of first-degree, felony murder. The defendant's course of action on September 24, 2014 -- obtaining a gun in advance of the shooting, lying in wait, undetected outside of the home,

- 24 -

attacking Ms. Beverly by grabbing her and pointing a gun to her head, threatening to shoot both Ms. Beverly and Mr. Dial, shooting Ms. Beverly, and then fleeing the scene as Mr. Dial ran for help -- established his conscious objective was to kill Ms. Beverly and Mr. Dial. The defendant admitted to Sevier County officers and the news media he intended to kill Mr. Dial on September 24, 2014. As such, the State established the defendant committed the first-degree, attempted murder of Mr. Dial with sufficient evidence and, in doing so, also provided sufficient evidence to sustain the conviction of the first-degree, felony murder of Ms. Beverly as the defendant's actions on September 24, 2014 resulted in her death. *Id.* at 167-68. The defendant is not entitled to relief as to this issue.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE

- 25 -